UNITED STATES of America,
Plaintiff-Appellant,

v.

Ernestine HORTON, d/b/a Pine View
Manor Nursing Home, and McKinley
Horton, Defendants-Appellees.

No. 84–3374.

United States Court of Appeals,
Eleventh Circuit.

May 21, 1985.

See also 622 F.2d 144.

Mark H. Gallant, Mark B. Stern, Janice Alperin, U.S. Dept. of Justice, Appellate Staff, Civil Div., Washington, D.C., for plaintiff-appellant.

John O'Brien, Bill R. Hutto, Panama City, Fla., for defendants-appellees.

Before GODBOLD, Chief Judge, HATCHETT, Circuit Judge, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal by the United States from a judgment by the district court holding that certain transfers of property which stood in the name of Ernestine Horton to herself and her husband, McKinley Horton, as tenants by the entirety, were not in fraud of creditors. In 1978, the United States obtained a judgment against Ernestine for Medicare program overpayments received by her in her operation

of the Pine View Manor Nursing Home. While that litigation was pending, Ernestine transferred the property in dispute, which had been held in her name alone, and which had at least partially been acquired by her from the proceeds of a sale of the nursing home, to herself and McKinley as tenants by the entirety. The United States, thereafter unable to collect its judgment, filed this suit.

## I. STATEMENT OF THE CASE

At the time of their marriage in 1960, McKinley had "a couple of thousand dollars" in the bank and Ernestine had a 45 bed nursing home. McKinley was an ironworker and made more money "most of the time" than Ernestine. McKinley's work required that he travel approximately 75 percent of the time throughout the United States and several foreign countries. He always endorsed his paycheck and sent it home to Ernestine who placed it in a joint account with her funds and into which she deposited her compensation as manager of the nursing home and any profits from the home.

In 1962, the couple acquired some real estate from funds in the joint account and placed the title in their joint names. In 1966, an additional parcel was acquired from the joint account funds. These two parcels were subdivided for sale.

The fact that McKinley was out of town so often created a problem with sales. To resolve the problem, the parties made Ernestine a free dealer under Florida law, and a deed was given from McKinley and Ernestine as tenants by the entirety to Ernestine as a free dealer.

After the free dealership, the parties continued to acquire property, the title to which was placed in Ernestine's name alone. The funds for acquisition still came from the joint account, McKinley's paycheck was still placed in the joint account, mortgage payments were made from the joint account, and any proceeds from sales were placed in the joint account.

It must be especially noted that the nursing home remained at all times the individual property of Ernestine, it having been enlarged to some 85 beds by 1968. Both Ernestine and McKinley testified that he had no interest in the nursing home.[1]

The nursing home was sold in 1969 for $450,000. After an existing mortgage was paid off, the net proceeds of approximately $216,000 were placed in the joint account.[2]

In 1975, McKinley obtained a job as an ironworker in Tennessee, where he could stay in one spot until his retirement. Ernestine then moved to Tennessee, traveling to Panama City to conduct their real estate business. At about the same time, Ernestine was served with the complaint in this action in which the United States claimed overpayment of Medicare benefits to Ernestine for her nursing home. This suit ultimately resulted in a judgment against her for $98,167.

Being unable to find any property in the name of Ernestine, the United States filed this supplementary action. It had discovered that she had signed deeds and transfers of mortgages on October 14, 1976, very shortly after the United States had filed a motion for summary judgment in the main

1. McKinley testified as follows:
   Q: Did you have a business relationship with the Pine View Nursing Home?
   A: No, sir.
   Q: You had no relationship of a business nature?
   A: No, sir.
   Q: What was your relationship with the nursing home?
   A: I had none.
   Q: You had none?
   A: No.
   Ernestine testified as follows:

   Q: Did Mr. Horton ever have any part or any ownership interest in the nursing home?
   A: No, he didn't.

2. The trial court found that of the $50,000 down payment, Ernestine paid out some $44,000 for expenses in preparing the home for transfer, leaving $6,000 plus the final payment of $210,-000 to be placed in the joint account. The court also found that the funds from the joint account, including this $216,000, were the source of the purchase price of the lands which the government sought to make subject to its judgment in this action.

action, which deeds conveyed the property which at that time was in her name alone to herself and her husband as tenants by the entirety. This supplemental complaint sought to have the deeds and transfers of mortgages set aside as in fraud of creditors.

The trial court made four critical findings of fact:

First, the court found that the United States had "established a prima facie case of fraud." So much was conceded by the Hortons. The court based its finding on what it said was well-established Florida law, first stated in *Bay View Estates Corp. v. Southerland*, 114 Fla. 635, 154 So. 894 (1934). There, the Florida Supreme Court stated:

> A fraud upon creditors consists in the intention by the debtor to prevent his creditors from recovering their just debts by withdrawing his property from the reach of his creditors. The rule has been frequently announced by this Court that a voluntary conveyance by one who is indebted is presumptively fraudulent when attacked by a judgment creditor upon a debt existing at the time of its execution. In such cases it is not necessary to show that the debtor was actually insolvent at the time he executed the conveyance.

154 So. at 899 (citations omitted).

Second, the court found:

> Based upon the evidence that's been submitted, there was no direct consideration given. However, it is also undisputed from the evidence that all the funds held by Mr. and Mrs. Horton were held in a joint fund, usually in the form of a joint checking account....
>
> Therefore, as to the consideration element, it's the finding of the court that consideration did flow to and fro, among all the transactions involved between this husband and wife, during the course of their marriage in 1960 and subsequent.

Third, on the issue of whether there was an agreement between the defendants prior to the conveyance that beneficial ownership was in the husband and wife, the court found that the evidence showed that the property was held by them with the understanding that each of them owned it jointly and equally, regardless of the title.

Fourth, the court addressed the question of whether the source of funds for the purchase of the property solely originated from Ernestine. The court expressed concern over the fact that the $260,000 proceeds from sale of the nursing home were placed in the joint account from which the realty was obtained. The court concluded, however,

> Regardless of whether the funds came from the nursing home, however, it's the finding of the court that the nursing home itself, during the period 1963 through 1969, when it was sold, was also treated by the parties as a joint endeavor. Mr. Horton testified that some of his funds and some of his time went into the nursing home. The testimony is that the size of the nursing home, at least in terms of beds, went from 45 to 85 beds during the time that they were married and before it was sold. So to that extent the husband can be deemed to have made a contribution which equitably would entitle him to a share of the proceeds, regardless of what that share might be. So that tracing the funds becomes almost an impossible task for the court, and the court deems the source of the funds for the purchase of the property originated to a substantial extent from the proceeds from the sale of the nursing home, but the court further finds that those funds did not represent the sole funds of Ernestine Horton.

## II. ISSUE

The issue for decision by this Court is whether there was sufficient evidence to support the district court's decision that the defendants had rebutted the prima facie case by the government.

## III. DISCUSSION

### A. *Standard of Review*

The parties agree that the findings of fact by the trial court are to be reviewed under the clearly erroneous standard.

Florida law controls the burden of proof in a case in which a prima facie case of fraud is established.

### B. *Legal Standards*

Both parties cite in support of their position as to the applicable law, the early Florida case, *Harkins v. Holt,* 124 Fla. 774, 169 So. 481 (1936):

> In a suit by creditors to set aside a conveyance made by a husband to his wife as fraudulent, the burden of proving consideration *proportionate to the value of the land conveyed* is upon the wife, and clearer and fuller proof is required than if the transactions had been between strangers. *Claflin v. Ambrose,* 37 Fla. 78, 19 So. 628; *Southern L. & S. Co. v. Verdier,* 51 Fla. 570, 40 So. 676. The burden of proving bona fides in such cases is consequently on the wife. In cases of insolvency or of failing circumstances, the presumption of fraud follows the showing of insolvency, regardless of whether the conveyance was voluntary or otherwise. *Southern L. & S. Co. v. Verdier, supra; Weathersbee et ux. v. Dekle,* 107 Fla. 517, 145 So. 198, 199. However, this presumption or inference of fraud is not conclusive, but is rebuttable, and when so rebutted and put in equipoise, it is then the duty of the party having the affirmative, upon whose allegations the issues are founded, to go forward with the evidence. *Harkins v. Holt, supra,* 169 So. at 482. (Emphasis added).

The government also cites the subsequent Florida case, *Foster v. Thornton,* 131 Fla. 277, 179 So. 882 (1938):

> [I]n a suit to set aside a conveyance, made by a husband to his wife, as fraudulent [brought by creditor] the burden of proving that the consideration for the conveyance was bona fide and proportionate to the value of the land conveyed is upon the wife, and clearer and fuller proof is required than if the transaction had been between strangers.

*Id.* 179 So. at 890.

It is apparent from the Florida court's opinion in *Harkins* that the court, within the same paragraph, stated the burden of proof differently, first stating that "the burden of *proving* consideration proportionate to the value of the land conveyed is upon the wife, and clearer and fuller proof is required than if the transactions had been between strangers." (Emphasis added.) And then again, "the *burden of proving bona fides* in such cases is consequently on the wife." (Emphasis added.) The court then refers to "cases of insolvency or of failing circumstances," as to which the court then says: "the presumption of fraud follows the showing of insolvency." It then states that the presumption is not conclusive but is rebuttable.

In *Foster v. Thornton,* also cited above, the court makes the flat statement that in such a suit as this, "the burden of proving that the consideration for the conveyance was bona fide and proportionate to the value of the land conveyed is upon the [transferee], and clearer and fuller proof is required than if the transaction had been between strangers."

### IV. DECISION

▮▮▮ In this case, we need not decide which reading of the Florida decisions is correct, because at the minimum it is clear from these early cases, that the transferee or grantee of property under such circumstances has more than the ordinary burden of proof to rebut the presumption. Here, it is clear that even taking all of the facts as determined by the trial court to be true, there was insufficient evidence to meet this requirement. This is true because not a word is said as to the dollar amounts contributed by McKinley either to the joint account or for the purchase of any of the property standing in Ernestine's name at the time of the transfers. The trial court seemed to indicate the need for some proof of the value of McKinley's contribution when it stated:

> So to that extent the husband can be deemed to have made a contribution which equitably would entitle him *to a*

*share of the proceeds* regardless of what that share might be.

██ Without, however, making any finding as to what the share amounted to, the court then found that "tracing the funds becomes almost an impossible task for the court," but then because the court found that the funds of the nursing home "did not represent the sole funds of Ernestine Horton" it found an equitable interest of McKinley Horton sufficient to justify the transfer of the property from her to their joint names. As is clearly shown by the two Florida Supreme Court cases from which we have quoted above, it is clear that the transferee's equitable interest in the transferred land must be proportionate to the consideration which he had given for the transfer. As concerns the nursing home, it had never been owned by the couple by the entireties, it had always belonged to her and she had obtained the mortgage on it which enabled her to double the size of the home.

██ Furthermore, the trial court's finding that "the nursing home itself, during the period 1963 through 1969, when it was sold, was also treated by the parties as a joint endeavor" is clearly erroneous. As noted in footnote 1, *supra*, both husband and wife testified unequivocally that the husband had absolutely "no ownership interest" in the nursing home.

Since there was no evidence offered to show the relative values of McKinley's contribution and the transferred property there was no evidence, much less substantial evidence, which the trial court could have found amounted to a rebuttal of the prima facie case. Ordinarily, the failure of the parties to carry whatever may be their burden either of going forward or of ultimate proof would justify a reversal of the judgment and the entry of judgment for the prevailing party. However, because of what we recognize as being a difficult task of discerning exactly what is required under the Florida law and, also, because this is clearly a problem that requires equitable considerations, we conclude that we should reverse the judgment and remand the case to the trial court for further proceedings. As an aside, it seems clear to the Court that with all of the financial transactions engaged in by these parties, it should be possible for them to produce sufficient evidence from which the trial court could make findings of fact as to the relative contributions to the value of the nursing home and contributions to the joint account by the two parties. Moreover, it appears to the Court that this is an appropriate case for the parties to make an extreme effort to settle this issue by stipulation.

The judgment is REVERSED and the case is REMANDED to the trial court for further proceedings not inconsistent with this opinion.

REVERSED and REMANDED.